UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**DEKOTA DEONTRE MOSELY**                                  CIVIL ACTION

**VERSUS**                                                 NO. 20-1385-DMD

**STEPHEN BERGERON, ET AL.**

## ORDER AND REASONS

Dekota Deontre Mosely, a state pretrial detainee, filed this federal civil action pursuant to 42 U.S.C. § 1983. He sued Stephen Bergeron, Brody Fanguy, Dontrell Steel, and Jerry Larpenter, claiming that they failed to adequately protect him from exposure to COVID-19. In his complaint, plaintiff stated his claim as follows:

> During the Covid 19 Pandemic masks for workers were made mandatory. For the first 5 days of the mandate trustees making food trays wore masks. After day 5 trustees were not wearing masks. Trustees come in contact with all officers who go home every day and in contact the virus. When this was brought to officers attention verbally and through grievance process this was ignored and not corrected. Therefore on numerous occasions every day during this pandemic trustees could have contracted the virus to us by handling the food and officers forced us to either accept the food trays or not eat endangering inmate populations health safety and lives.[1]

The defendants have filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.[2] Plaintiff was ordered to file a response to that motion on or before March 17, 2021;[3] however, no response was filed. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).[4]

---

[1] Rec. Doc. 4-1, p. 5.
[2] Rec. Doc. 19.
[3] Rec. Doc. 20.
[4] Rec. Doc. 18.

In their motion, the defendants argue that they are entitled to summary judgment based on qualified immunity. "Qualified immunity shields government officials from civil liability in their individual capacity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. It protects all but the plainly incompetent or those who knowingly violate the law." Cunningham v. Castloo, 983 F.3d 185, 190-91 (5th Cir. 2020) (citations and quotation marks omitted). Regarding an assertion of qualified immunity on summary judgment, the United States Fifth Circuit Court of Appeals recently explained:

> Qualified immunity changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden.
> A plaintiff suing for a constitutional violation has the ultimate burden to show that the defendant violated a constitutional right – that is, the plaintiff must make this showing whether or not qualified immunity is involved. But when qualified immunity is involved, at least in this circuit, a plaintiff has the additional burden to show that the violated right was "clearly established" at the time of the alleged violation.
> This expanded substantive burden isn't the only special feature of qualified immunity. Burden shifting changes, too. Under the ordinary summary-judgment standard, the party who moves for summary judgment bears the initial burden to show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The movant satisfies this burden by showing that a reasonable jury could not find for the nonmovant, based on the burdens that would apply at trial. For a defendant, this means showing that the record cannot support a win for the plaintiff – either because the plaintiff has a failure of proof on an essential element of its claim or because the defendant has insurmountable proof on its affirmative defense to that claim. The defendant can show this by introducing undisputed evidence or by pointing out an absence of evidence to support the plaintiff's case. If the defendant succeeds on that showing, the burden shifts to the plaintiff to demonstrate that there is a genuine issue of material fact and that the evidence favoring the plaintiff permits a jury verdict in the plaintiff's favor.
> But that changes with qualified immunity. When a public official makes a good-faith assertion of qualified immunity, that alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available. In other words, to shift the burden to the plaintiff, the public official need not show

> (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law.
>
> Once the burden is on the plaintiff, things briefly sound familiar again: The plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury. That would be the same if the plaintiff did not face qualified immunity. But, to overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law. This requires the plaintiff to identify a case – usually, a body of relevant case law – in which an officer acting under similar circumstances was held to have violated the Constitution. While there need not be a case directly on point, the unlawfulness of the challenged conduct must be beyond debate. This leaves the rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear even though existing precedent does not address similar circumstances.
>
> Moving from the bar to the bench, qualified immunity similarly changes the court's normal task on summary judgment. A court decides whether summary judgment is appropriate by viewing the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor (so far normal), then determining whether the plaintiff can prove a constitutional violation (still normal) that was clearly established (not normal).

State *ex rel.* Estate of Joseph v. Bartlett, 981 F.3d 319, 329-30 (5th Cir. 2020) (footnotes, quotation marks, brackets, and ellipsis omitted).

In the instant case, the constitutional provision implicated by plaintiff's claim is the Fourteenth Amendment. Pursuant to that amendment, penal officials have a duty to provide a pretrial detainee in their custody "with basic human needs, including … protection from harm, during [his] confinement." Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996). "To establish a failure-to-protect claim under § 1983, [an inmate] must show that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection." Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995).

As to the first prong of that analysis, "[t]here is no doubt that infectious diseases generally and COVID-19 specifically can pose a risk of serious or fatal harm to prison inmates." Valentine

3

v. Collier, 956 F.3d 797, 801 (5th Cir. 2020). However, that, in and of itself, does not suffice. Rather, not only must the harm in question be serious, but also the risk of that harm must be substantial. Here, even if the jail trustees failed to wear face masks when preparing food trays as alleged, it is unclear whether that failure placed plaintiff at substantial risk of contracting COVID. On the contrary, the guidance from the Centers for Disease Control ("CDC") and other experts suggests that the risk of contracting COVID through food service is actually quite low.[5]

Moreover, in any event, the second prong of the analysis requires that the defendants acted with deliberate indifference. In the instant case, the Court finds plaintiff has pointed to no evidence of deliberate indifference on the part of the named defendants.

"Deliberate indifference is an extremely high standard to meet." Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate

---

[5] "Currently, there is no evidence that the virus that causes COVID-19 spreads to people through food." See https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/food-and-COVID-19.html (updated Dec. 31, 2020). "Coronaviruses, like the one that causes COVID-19, are thought to spread mostly person-to-person through respiratory droplets when someone coughs, sneezes, or talks. It is possible that a person can get COVID-19 by touching a surface or object, including food or food packaging, that has the virus on it and then touching their own mouth, nose, or possibly their eyes. However, this is not thought to be the main way the virus spreads." Id. The CDC states:

> The risk of getting COVID-19 from food you cook yourself or from handling and consuming food from restaurants and takeout or drive-thru meals is thought to be very low. Currently, there is no evidence that food is associated with spreading the virus that causes COVID-19.
> The risk of infection by the virus from food products, food packaging, or bags is thought to be very low. Currently, no cases of COVID-19 have been identified where infection was thought to have occurred by touching food, food packaging, or shopping bags.
> Although some people who work in food production and processing facilities have gotten COVID-19, there is no evidence of the virus spreading to consumers through the food or packaging that workers in these facilities may have handled.

Id. Other experts agree. See, e.g., https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/can-coronavirus-spread-food-water/faq-20485479 (updated Oct. 13, 2020) ("There's no evidence of anyone contracting the virus that causes COVID-19 after touching food containers and food packaging.").

4

indifference. To reach the level of deliberate indifference, official conduct must be 'wanton,' which is defined to mean 'reckless.'" Alderson v. Concordia Parish Correctional Facility, 848 F.3d 415, 420 (5th Cir. 2017) (citation and quotation marks omitted).

Indeed, "[i]n order to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Neals, 59 F.3d at 533 (internal quotation marks omitted). Accordingly, "[a]ctual knowledge **and** appreciation of the risk are required." Smith v. Jaramillo, 394 F. App'x 183, 185 (5th Cir. 2010) (emphasis added). Further, "[d]eliberate indifference must be viewed from [the defendant's] perspective at the time in question, not with hindsight's perfect vision." Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998); accord Dangerfield v. Dyson, Civ. Action No. 05-0650, 2008 WL 718114, at *3 (E.D. La. Mar. 14, 2008). Lastly, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer v. Brennan, 511 U.S. 825, 844 (1994).

Here, the undisputed evidence shows that substantial efforts have been taken at the Terrebonne Parish Criminal Justice Complex to protect the facility's inmates from COVID-19. For example, in an affidavit submitted in support of the instant motion, defendant Stephen Bergeron states:

> I am employed by the Terrebonne Parish Sheriff's Office as the Chief of Corrections for the Terrebonne Parish Sheriff's Office which includes overall responsibilities for the Terrebonne Parish Criminal Justice Complex. I hold the rank of Major and, again, I was at all relevant times herein in charge of the facility to ensure that all policies and procedures for the operation of the facility were followed, that the safety and security for employees as well as inmates were provided for, and that inmates receive all constitutional guarantees that they are entitled to within the law.

5

Beginning in March 2020 our facility began receiving information about the COVID-19 pandemic from the Center of [sic] Disease Control (CDC) as to how to address health problems related to same. Thereafter, in March of 2020 we continued to receive information from the CDC and reached out to the Louisiana Department of Corrections (DOC) for further guidance in dealing with this issue.

We encouraged the frequent washing of hands and increased the areas of cleaning within the facility for employees, visitors, and inmates. The temperature of all incoming inmates was taken. During that month visitation for all public visits for inmates ceased with only attorney/inmate visits allowed.

In April 2020 all staff and trustees working within the facility were required to wear masks and that policy continues to date. Beginning in April of 2020 and continuing to date, decontamination spraying of the entire facility began.

In May 2020 zoom meetings with CDC and DOC, and the Louisiana Department of Health and Hospitals were held to gain additional information and recommendations to help combat the COVID-19 pandemic. In May of 2020 we began a system of trying to quarantine those inmates who had COVID-19 away from other inmates who did not, to the best of our ability, space limitations, and of course maintaining the proper classification level of inmates in the facility for the protection of all inmates.

Again, in June of 2020 the spraying/disinfecting of the facility continued. The temperature of all employees at the TPCJC were taken twice a day and all incoming inmates were checked for COVID-19 symptoms including the taking of their temperatures.

In July 2020 the facility protocols for cleaning/disinfecting continued as well as all other protocols that had been in place. Also, all incoming inmates were quarantined for 14 days before placed in general population.

To-date all COVID-19 protocols continue and are updated by recommendations from the CDC, DOC, Louisiana Department of Health and Hospitals, as well as the Sheriff's Association, and other sources. Our protection of the staff of the TPCJC as well as the inmates housed in same, continue to be a top priority as the health response to COVID-19 improves.

As to plaintiff Mosley's [sic] complaint in his petition filed in May of 2020, there existed at the time of his complaint a mask mandate and same continues to date for all staff in the TPCJC, inmate workers, and visiting attorneys. If an inmate worker/trustee lets his mask slip down he would be told to pull same back up. It is conceded such an incident could have occurred, but such an incident would be isolated and the mask mandate enforced.

Also, all grievances filed by Plaintiff Mosely were timely answered about the alleged incident herein, and staff and workers were reminded to wear their masks when performing their daily duties within the facility.[6]

---

[6] Rec. Doc. 19-3.

A similar affidavit was provided by the TPCJC Medical Administrator, Richard Neal, who states:

> I am employed by the Terrebonne Parish Consolidated Government as the Medical Administrator for the Terrebonne Parish Criminal Justice Complex which includes overall responsibilities for the health care of all inmates housed in said facility. I am tasked with the responsibility to help develop, recommend and implement Health Care Policies and Procedures for the facility to ensure that the health and safety of all inmates are provided for, and that inmates receive all constitutional guarantees that they are entitled to within the law as same relates to their health and safety.
> Beginning in March 2020 Major Stephen Bergeron and I began receiving information about the COVID-19 pandemic from the Center of [sic] Disease Control (CDC) as to how to address health problems related to same and specifically care for inmates housed in a prison setting. Thereafter, in March of 2020 we continued to receive information from the CDC and we reached out to the Louisiana Department of Corrections (DOC) for further guidance in dealing with this health issue.
> Major Bergeron and I encouraged the frequent washing of hands and increased the areas of cleaning within the facility for all employees of the facility, visitors, and inmates. The temperature of all incoming inmates was taken by my staff as part of the Booking process. During that month it was also recommended that visitation for all public/family visits for inmates be ceased with only attorney/inmate visits allowed.
> In April 2020 Major Stephen Bergeron and myself recommended that all staff and trustees working with [sic] within the facility be required to wear masks and that policy continues to date. Beginning in April of 2020 and continuing to date, Parish Government began decontamination spraying of the entire facility. Such decontamination spraying continues to date.
> In May 2020 zoom meetings with CDC and DOC, and the Louisiana Department of Health and Hospitals was held to gain additional information and recommendations to help combat the COVID-19 pandemic. Such meetings were attended by both medical and corrections staff. In May of 2020 I recommended and Major Bergeron agreed to follow, a system of trying to quarantine those inmates who had COVID-19 away from other inmates who did not, to the best of our ability, space limitations, and of course working with the corrections staff to maintain the proper classification level of inmates in the facility for the protection of all inmates.
> Again, in June 2020 the spraying/disinfecting of the facility continued. The temperature of all employees at the facility were taken twice a day and all incoming inmates were checked for COVID-19 symptoms including the taking of their temperatures.

7

> In July 2020 the facility developed protocols for all incoming inmates to be quarantined for 14 days before placed in general population.
> To date all COVID-19 protocols continue and are updated by recommendations from the CDC, DOC, Louisiana Department of Health and Hospitals, as well as the Sheriff's Association, and other sources. Our protection of the staff of the facility as well as the inmates housed in same, continue to be a top priority as the health response to COVID-19 improves.
> As to plaintiff Mosley's [sic] complaint in his petition filed in May of 2020, there existed at the time of his complaint a mask mandate, and same continues to date for all staff in the facility, inmate workers, and visiting attorneys. To my knowledge both my medical staff as well as the corrections staff, adhere to such a mandate. If an inmate worker/trustee lets his mask slip down, he would, for example, be immediately told to pull same back up. It is conceded such incidents could have occurred, but such an incident would be isolated, and the mask mandate is strictly enforced for all staff and workers in the facility.[7]

The defendants have therefore presented evidence that jail policy actually **required** inmate workers (also known as "trustees") to wear masks, and, in fact, plaintiff conceded as much in his complaint. He simply alleges that the policy, although in existence, was not adequately enforced. But his allegations fall short.

As noted, plaintiff alleges in his complaint that despite the fact that the trustees' noncompliance with the mask policy was brought to the attention of "officers" "verbally and through [the] grievance process," the situation was "ignored and not corrected."[8] However, importantly, plaintiff does not identify the officers allegedly made aware of the noncompliance, much less expressly state that it was any of the four defendants named in this lawsuit.

In fact, the names of three of the defendants – Brody Fanguy, Dontrell Steel, and Jerry Larpenter – appear nowhere in plaintiff's complaint other than in his listing of the defendants. At no point does plaintiff allege that Fanguy, Steel, and Larpenter were personally aware of the

---

[7] Rec. Doc. 19-4.
[8] Rec. Doc. 4-1, p. 5.

purported noncompliance by the trustees. That omission is crucial because "[p]ersonal involvement is an essential element of a civil rights cause of action." Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983). Merely listing a defendant in a complaint without making the factual allegations necessary to connect that defendant to a claim simply does not suffice. See Tuley v. Heyd, 482 F.2d 590, 594 (5th Cir. 1973) (noting that the mere inclusion of names and notations of office in the caption does not suffice to state a claim); Jones v. Ledet, Civ. Action No. 19-10969, 2019 WL 6040091, at *3 (E.D. La. Oct. 22, 2019) ("Where … a plaintiff has merely listed individuals as defendants in the complaint but made no factual allegations against them, no cognizable individual-capacity claim has been stated against those defendants."), adopted, 2019 WL 6036706 (E.D. La. Nov. 14, 2019). For that reason alone, plaintiff's claims against Fanguy, Steel, and Larpenter fail.

The claim against defendant Stephen Bergeron, however, requires closer scrutiny. Although plaintiff makes no express factual allegation against Bergeron in the complaint, he does at least attach to his complaint a copy of one grievance concerning this matter to which Bergeron responded. In that grievance, plaintiff, without elaboration, stated: "TRUSTEE PUT MY LIFE AT RISK BY NOT WEARING HIS PROTECTIVE MASK AND OFFICER DID NOT MAKE HIM … THIS VIRUS IS VERY CONTAGIOUS AND LIFE THREATENING AND THIS SHOWS LACK OF CARE FOR INMATE SAFETY."[9] That grievance was denied by "Lt. T. Schwausch," who is not a defendant herein. However, when plaintiff appealed, it was **Bergeron** who then responded and denied relief.[10]

---

[9] Rec. Doc. 4-1, p. 7 (ellipsis in original).
[10] Id.

Of course, the mere fact that Bergeron denied the grievance is not alone a constitutional violation, because an inmate simply has no constitutional right to an adequate and effective grievance procedure or to have his complaints investigated and resolved to his satisfaction. Bonneville v. Basse, 536 F. App'x 502, 503 (5th Cir. 2013); Propes v. Mays, 169 F. App'x 183, 184-85 (5th Cir. 2006); Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005). Nevertheless, that does not mean the grievance is immaterial. On the contrary, a grievance can, in some circumstances, be used as evidence to support a failure-to-protect claim. Cf. Baker v. Smith, No. 93-4308, 1993 WL 241599 (5th Cir. June 21, 1993) ("If Baker's grievances gave Warden Waldron notice that Baker was in danger of attack by other inmates, and Warden Waldron intentionally or recklessly disregarded these warnings, then Baker may prevail on his claims of deliberate indifference."); Roy v. Orleans Parish Sheriff's Office, Civ. Action No. 15-701, 2015 WL 7750498, at *5 (E.D. La. Oct. 5, 2015) ("*If,* as a result of the grievance, Gusman was in fact aware of plaintiff's circumstances and had actual knowledge that plaintiff was in danger, … then there *may* be a basis to hold Gusman liable on a failure-to-protect claim."), adopted, 2015 WL 7756102 (E.D. La. Dc. 1, 2015).[11]

However, even if plaintiff can be said to have implicitly stated a claim against Bergeron by attaching that grievance in support of the vague allegation made in the written complaint, plaintiff's claim against Bergeron still fails.

That grievance alleged that a trustee (who was not identified) performed a task of some kind (which also was not identified) without wearing a mask, and that an officer (who likewise

---

[11] The Court notes that plaintiff subsequently filed two other grievances concerning this issue; however, those two grievances were denied by Schwausch and not appealed. Id. at pp. 9-10. There is no evidence that Bergeron or any of the other defendants herein were aware of those two grievances.

10

was not identified) took no action to force the trustee to wear his mask on that one occasion. However, without more, Bergeron's mere awareness of that grievance is insufficient to give rise to a viable failure-to-protect claim against him, because an inmate generally "cannot establish a substantial risk of serious harm through a single incident." Wallace v. Doe, 512 F. App'x 141, 144 (3d Cir. 2013); cf. Anderson v. Wilkinson, 440 F. App'x 379, 382-83 (5th Cir. 2011). Simply put, the fact that Bergeron was aware of that one discrete incident would not be enough for a trier-of-fact to find that Bergeron was therefore on notice of a continuing or pervasive problem at the jail that posed a substantial risk of serious harm to plaintiff.

Even more critically, plaintiff, who has not opposed the instant motion, has made no effort whatsoever to overcome Bergeron's invocation of qualified immunity. For example, plaintiff has made no attempt to meet his burden "to identify a case … in which an officer acting under similar circumstances was held to have violated the Constitution." State *ex rel.* Estate of Joseph v. Bartlett, 981 F.3d 319, 330 (5th Cir. 2020) (footnote, quotation marks, brackets, and ellipsis omitted). Therefore, even if he can be said to have adequately alleged the personal involvement of Bergeron concerning the purported failure to enforce the mask policy, plaintiff clearly has not defeated Bergeron's assertion of qualified immunity.

For all of these reasons,

**IT IS ORDERED** that the defendants' unopposed motion for summary judgment, Rec. Doc. 19, is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the final pretrial conference and the trial scheduled in this case are hereby **CANCELED**.

New Orleans, Louisiana, this __26th__ day of March, 2021.

                                                                                                _____
                                                                                                 **DANA M. DOUGLAS**
                                                                                                 **UNITED STATES MAGISTRATE JUDGE**